# EXHIBIT 2

CONSTANCE FOOTE · CondenseIt!™ · DECEMBER 4, 2009

Page 1

COMMONWEALTH OF KENTUCKY
LETCHER CIRCUIT COURT

PATTY PROFITT, AS NEXT FRIEND OF )
RALPH EDWARD PROFITT, AN ADULT )
UNDER DISABILITY; AND PATTY )
PATTY PROFITT, INDIVIDUALLY )
    PLAINTIFFS )
VS. ) C. A. NO. 08-CI-360
CORLEY MANUFACTURING CO., D/B/A )
CORLEY SAWMILL MACHINERY; M & R )
CONSTRUCTORS, INC., APPALACHIAN )
REGIONAL HEALTHCARE, INC., D/B/A )
WHITESBURG ARH HOSPITAL; US )
NURSING CORPORATION; PINE MOUNTAIN )
LUMBER; CONSTANCE FOOTE AND SHEILA )
HURT )
    DEFENDANTS )

* * * * *  * * * * *

The videotaped deposition of CONSTANCE FOOTE was taken on behalf of the Plaintiffs before DARLENE GIBSON, Certified Court Reporter and Notary Public, State of Kentucky at Large, at the Harry M. Caudill Memorial Library, located at 220 Main Street in Whitesburg, Kentucky, on December 4, 2009, beginning at the hour of 9:00 a.m. Said deposition was taken by notice to be used for discovery purposes and for any and all other purposes as allowed by the Rules of Civil Procedure.

* * * * *  * * * * *

TIMELY REPORTING
DARLENE GIBSON, COURT REPORTER
P.O. BOX 125
PIPPA PASSES, KENTUCKY 41844
(606) 447-2468

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Adam Collins, Esq.
Nathan Collins, Esq.
Patrick Conley, Esq.
Randy Campbell, Esq.
CAMPBELL, COLLINS AND COLLINS
P. O. Box 727
Hindman, Kentucky 41822
FOR PATTY PROFITT AND RALPH
EDWARD PROFITT

Ronnie M. Slone, Esq.
P. O. Box 909
Prestonsburg, Kentucky 41653
FOR PATTY PROFITT AND RALPH
EDWARD PROFITT

ON BEHALF OF THE DEFENDANT:

Jane Higgins, Esq.
PHILLIPS, PARKER, ORBERSON
& MOORE, PLC
163 East Main Street, Ste. 110
Lexington, Kentucky 40507
FOR M & R CONSTRUCTORS

Donald L. Jones, Esq.
P. O. Box 276
Paintsville, Kentucky 41240
FOR CORLEY MANUFACTURING COMPANY

Bayard V. Collier, Esq.
BOEHL, STOPHER & GRAVES, LLP
P. O. Box 1139
Pikeville, Kentucky 41502
FOR WHITESBURG ARH

TIMELY REPORTING 2

Page 3

Erich E. Blackburn, Esq.
P. O. Box 1439
Pikeville, Kentucky 41502
FOR SHEILA HURT AND ROXANNA PARSONS

Carl Brashear, Esq.
P.O. Box 24564
Lexington, Kentucky 40524
FOR PINE MOUNTAIN LUMBER

Byron K. Miller, Esq.
600 West Main Street, Suite 500
Louisville, Kentucky 40202
FOR CONNIE FOOTE AND
US NURSING CORPORATION

ALSO PRESENT:

William "Moe" Shumate
M & R CONSTRUCTORS

* * * * *  * * * * *

I N D E X

Examination by Mr. Collins............4 - 234
Examination by Ms. Higgins............234 - 236
Examination by Mr. Miller.............236 - 238
Reexamination by Mr. Collins..........238 - 243
Certification.........................244

* * * * *  * * * * *

TIMELY REPORTING 3

Page 4

1     BY THE VIDEOGRAPHER: On the record. The time is
2 9:29 a.m. The date is Friday, December 4, 2009. This is
3 the video deposition of Constance Foote, Nurse. The
4 location is Harry M. Caudill Memorial Library, Whitesburg,
5 Kentucky: Commonwealth of Kentucky, Letcher Circuit Court,
6 Civil Action Number 08-CI-0-0360, Patty Profitt, as Next
7 Friend of Ralph Edward Profitt, an Adult Under Disability
8 and Patty Profitt, Individually, Plaintiffs, versus Corley
9 Manufacturing Company, doing business as Corley Sawmill
10 Machinery; M & R Contractors, Incorporated; Appalachian
11 Regional Healthcare, Incorporated, doing business as
12 Whitesburg ARH Hospital; US Nursing Corporation; Pine
13 Mountain Lumber; Constant Foote and Sheila Hurt,
14 Defendants. My name is William J. Ward, I'm the
15 videographer. The reporter is Darlene Gibson. All
16 objections will be reserved and shall not be stated on the
17 video recording except for an objection relating to the
18 form of a question. The attorneys will please introduce
19 themselves, who they represent and the court reporter will
20 swear the witness.
21     BY MR. ADAM COLLINS: My name is Adam Collins and
22 I represent Patty Profitt and Ralph Profitt.
23     BY MR. NATHAN COLLINS: Nathan Collins on behalf
24 of Plaintiffs Patty Profitt and Ralph Profitt.
25     BY MR. CONLEY: Patrick Conley for the


EXHIBIT 2

**Page 113**

1  answer.
2    Q. Go ahead.
3        BY MR. MILLER: Yeah, you did.
4    A. To the best of my knowledge, I don't
5  remember him, I don't know what the situation really was.
6  If this is a person that-- I'm not big enough to be picking
7  somebody else up. I've reviewed the chart, my name is
8  nowhere, and there is no documentation that I can find in
9  any part of the chart that says-- and if I thought that
10 somebody had a neurological deficit of some kind, I would
11 certainly have to get other help before I could even
12 consider moving somebody from that situation. So, no, I do
13 not remember moving Mr. Profitt from somewhere outside the
14 hospital into the hospital. No, sir.
15   Q. Okay. And you mentioned in your answer
16 that you've seen no documentation that indicates that you
17 moved him, correct?
18   A. I saw no documentation with my name on it
19 in the chart at all, sir.
20   Q. Okay. And my question is have you seen,
21 have you seen any documentation that indicated that you
22 moved him from the outside of the hospital to the inside of
23 the hospital? Yes or no?
24       BY MR. MILLER: Asked and answered.
25   Q. Have you seen any information?

**Page 114**

1        BY MR. COLLINS: And that's not been asked
2  and answered.
3    Q. Have you seen any information?
4    A. Have I seen any information in the chart
5  that says I did...
6    Q. When you've referred to charts or anything?
7  You referred to charts, but I'm saying any information,
8  whether it's a, whether it's a chart or any other type of
9  documentation or any information?
10   A. I do not remember seeing any information
11 that said I had anything to do with moving him into the
12 hospital.
13   Q. Okay. You can agree that it's part of your
14 protocol as a nurse if that would have happened, you should
15 have documented that? That's something that should have
16 been documented?
17       BY MR. MILLER: Objection, argumentative.
18   Q. You can agree with that, can't you?
19       BY MR. MILLER: You've asked, you've asked
20 that question three times.
21   Q. You can agree that it's something that
22 should have been documented, correct, if it happened?
23   A. If I moved somebody that had a deficit, it
24 would take more than me to do it and it would mean C-spine
25 immobilizing them for transport.

**Page 115**

1    Q. C-spine immobilizing them for transport?
2  What about thoracic spine and lumbar spine? You wouldn't
3  do that, would you?
4        BY MR. MILLER: Objection.
5    Q. Did I understand you to say that that way?
6        BY MR. MILLER: Objection, argumentative.
7    Q. Just tell me what you meant to say.
8    A. When you C-spine immobilize somebody, you
9  put a C-collar on. You backboard them so that from their
10 neck all the way down, they're not moving. That's C-spine
11 immobilization.
12   Q. How long have you known that that's the,
13 the standard when you think somebody has got a, got a, a
14 neurological injury...
15       BY MR. MILLER: Objection.
16   Q. ... spinal neurological injury?
17       BY MR. MILLER: Objection.
18   Q. How long have you known that?
19       BY MR. MILLER: Objection.
20 Mischaracterized her testimony. She didn't say standard.
21   Q. How long? You just-- whatever your answer
22 was there, how long have you known that?
23   A. How long would, have I known that I would
24 C-spine immobilize somebody?
25   Q. Uh-huh (yes).

**Page 116**

1    A. Since I started working in the emergency
2  room.
3    Q. Which emergency room?
4    A. Any emergency room that I've worked in.
5    Q. Well, you said since, you've known that
6  since you started working in the emergency room. Which,
7  when would have been the first time that you would have
8  known that? When would have been the first time that
9  started-- you learned that in an emergency room? What
10 emergency room was it, I guess is what I'm asking?
11   A. Probably Beaumont, Texas.
12   Q. Okay. So if I'm understanding you
13 correctly, you didn't learn that in nursing school, it took
14 till you got into the emergency room before you learned
15 that, is that correct?
16   A. No, that's not correct, sir.
17   Q. Are you able to hear the questions that I'm
18 asking you good?
19   A. Yes, sir.
20   Q. Okay. How do you assess that condition
21 before you determine that someone does or does not need
22 this immobilization? What do you do to assess that?
23       BY MR. MILLER: Objection to the form.
24   Q. As a nurse with your training?
25   A. You talk to them, you find out what

Page 117

1 happened, you would check for movement, sensation.
2    Q. Anything else?
3    A. That's the main thing.
4    Q. Is there anything else though? That may be
5 the main thing, but is, but there are other collateral or
6 related thighs that should be done to assess someone to
7 determine whether they should be immobilized?
8       BY MR. MILLER: Objection to the form.
9    Q. There's not any way...
10    A. I mean depending what the situation is.
11    Q. Okay. Assume that it's the most extreme
12 situation. What other things would you do?
13       BY MR. MILLER: Objection to the form.
14 Calls for speculation.
15    Q. What is the specific protocol for assessing
16 an injury when someone is brought to an emergency room?
17       BY MR. MILLER: Objection to the form.
18    A. Are you talking about a spinal...
19    Q. Anything, just, just generally when
20 someone, when someone shows up at an emergency room what
21 is, what is the specific protocol? And I'm going to ask
22 about the other one in a second, but...
23       BY MR. MILLER: Objection. Overly broad,
24 unclear.
25    A. You normally-- the patient is triaged.

Page 118

1    Q. Uh-huh (yes). Describe that for me.
2    A. You ask questions, you do vital signs, you
3 assess for pulses, you assess for sensation.
4    Q. Anything else?
5    A. You listen to heart tones, you listen to
6 lung fields.
7    Q. Anything else?
8    A. You basically do a brief assessment and
9 then you do a secondary assessment once you figure out what
10 needs to be done immediately.
11    Q. Okay. Anything else?
12    A. I think that's it.
13    Q. Is it-- what about the specific protocol
14 when you recognize that someone has a spinal injury?
15       BY MR. MILLER: Objection to form.
16    Q. If there is one in your mind.
17    A. You would get some help and you would get
18 them-- assuming they're coming-- you're saying they're
19 coming in without being C-spine immobilized, right?
20    Q. Well, I'm just saying what, you know,
21 either way. Is there a specific protocol that you follow
22 when someone has a spinal injury? And if not, you can tell
23 me no, there's not or yes, there is, but it's different on
24 two different circumstances. I want your answer.
25       BY MR. MILLER: Objection, overly broad.

Page 119

1    A. If somebody comes in and a spinal injury is
2 suspected then they should be back boarded, C-collar and
3 then it's up to the doctor what transpires next.
4    Q. Okay. And, and should the be back boarded
5 and C-spined before they are moved or, or relocated or
6 anything of that nature?
7       BY MR. MILLER: Objection to form.
8    Q. Just to your knowledge.
9    A. If there is a serious injury...
10    Q. Uh-huh (yes).
11    A. ... a person should be backboarded and C-
12 collared when the injury occurs, yes, sir.
13    Q. Okay. What about when, if they're not--
14 when you first see them, when-- if you find somebody that
15 you believe has a serious spinal injury and they've not
16 been backboarded and C-spined when you first see then, what
17 do you, what are you supposed to do?
18       BY MR. MILLER: I'm going to object to the
19 form. You said C-spined?
20       BY MR. COLLINS: That's what she said. She
21 said C-spined and immobilized.
22       BY MR. MILLER: C-spined? I think she said
23 C-collared.
24       BY MR. COLLINS: C-collared. Either way.
25       BY MR. MILLER: Well, there's a difference

Page 120

1 between the two.
2       BY MR. COLLINS: Can we, can we take a
3 break?
4       BY MR. MILLER: Sure.
5       BY MR. COLLINS: Take a break.
6       BY THE VIDEOGRAPHER: Off the record,
7 p. m.
8       (REPORTER'S NOTE: AFTER A PAUSE IN THE
9 PROCEEDING, EXAMINATION AND TESTIMONY RESUMED AS FOLLOWS:)
10       BY MR. COLLINS: Twice we've had the
11 videographer read the rule in. It's apparent that counsel
12 for Ms. Foote will not follow the rule. At this time I'm
13 giving him notice and giving everyone else notice that we
14 will, that it is a distinct likelihood that we will be
15 filing a motion for cost and a motion to reexamine Ms.
16 Foote for failure to comply with the rule. The only
17 objections, again, are, proper objections are to the form
18 of the question.
19       BY MR. MILLER: I object to your objection.
20 It's out of line.
21       BY THE VIDEOGRAPHER: Back on the record,
22 1:47 p. m.
23    Q. Ms. Foote, you mentioned in your assessment
24 earlier, when you are assessing someone that you talk to
25 them and you check for sensation, correct, when we're

Page 129

1 this.
2     Q. My question, do you know?
3     A. I don't know what you're asking. At this
4 point, no, sir, I don't know.
5     Q. Okay. Someone-- you can agree that
6 sometimes people come in with spinal cord injuries,
7 potential spinal cord injuries and sometimes they're
8 immobilized and sometimes they're not. Would-- that's not
9 a leap, is it? I mean you can see the potential for that.
10     A. That's true.
11     Q. Okay. And you mentioned, you gave an
12 answer a moment ago and said if they're brought in on a, on
13 a, on a, immobilized on a spine board then I do these
14 assessments and these things. And my question for you is
15 if someone is brought in and they are not on a spineboard,
16 before you move them, before you transport them and before
17 you begin to immobilize them by placing them on a
18 spineboard, do you do the full assessment of what the
19 things that you've described for us or do you do partial
20 or, or some or none?
21     BY MR. MILLER: Objection. Calls for
22 speculation. Asked and answered.
23     Q. I mean the jury is going to see this tape.
24 You-- and I think my question is very understandable. And,
25 and, and I'm at a lost to why you can't understand it. So

Page 130

1 do you want me to rephrase it again?
2     BY MR. MILLER: Okay. Now you're badgering
3 the witness. Number one, there's no judge who has said the
4 jury is going to see this tape. But number two, she hasn't
5 said that she's at a loss by your question.
6     Q. Can you answer my question then?
7     A. Generally, if I came out to you...
8     Q. Okay.
9     A. ... and I looked at you and I assessed you
10 briefly, and I asked you what had happened, and if I
11 suspected, based on what you had told me, that you could
12 have a spinal cord injury, then I would get some help, get
13 you immobilized, and if you were out wherever, and get you
14 into the ER. Does that answer your question?
15     Q. It, it generally does, and I have a follow-
16 up to that, because you assumed that I wasn't immobilized
17 when you, in your, in your, the scenario that you gave me.
18 My question is, is before immobilizing me, because you used
19 me as your example, before immobilizing me, would you do
20 the full assessment that we've talked about here earlier or
21 would you do some portions or not all of it or none of it?
22 You mentioned that you do a full assessment on a spinal
23 cord and you do an assessment for other, other matters.
24 Would you do the full assessment before immobilizing me?
25     BY MR. MILLER: Asked and answered.

Page 131

1     A. I believe I told you that I would find out,
2 talk to you and find out what had happened, which would be
3 part of the assessment, and then that would help me
4 determine what the next step would be. In that case, if I
5 thought you were C-spine compromised, then I would get help
6 and we would get you immobilized. Does that answer-- to
7 the best of my knowledge, it appears that that would answer
8 the question. If not, I'm a little bit confused.
9     Q. Before immobilizing me would you do the
10 full assessment or would you do a partial assessment?
11     BY MR. MILLER: Don't answer that. This is
12 the fifth time. This is ridiculous.
13     BY MR. COLLINS: I've not got an answer to
14 the question either.
15     BY MR. MILLER: This is ridiculous. You
16 have asked this question five times.
17     BY MR. COLLINS: You want to talk about
18 ridiculous? You're ridiculous interrupting everyone here.
19 And, again, we will be asking for cost in this and we're
20 probably going to ask that you come back here for the
21 deposition. But, again, I remind you of the rule, Mr.
22 Miller. Let me move on.
23     BY MR. MILLER: Let me remind you that you
24 can not badger or harass a witness...
25     BY MR. COLLINS: I'm not..

Page 132

1     BY MR. MILLER: ... which is what you're
2 doing by asking a witness the same question five or six
3 times.
4     BY MR. COLLINS: I'm not getting an answer,
5 is why I'm asking the question over and over.
6     BY MR. MILLER: She gave you a direct
7 answer...
8     Q. Can you answer yes or no?
9     BY MR. MILLER: ... to your question.
10     Q. This is a yes or no question, okay? Simple
11 yes or no. You know yes or no questions, right?
12     BY MR. MILLER: Don't answer that. That's-
13 - sorry, that's ridiculous.
14     BY MR. COLLINS: I didn't mean to kick you
15 there. I was crossing my legs. Sorry about that.
16     Q. Before immobilizing someone that's come in
17 with a spinal cord injury that is not immobilized when they
18 get there, do you do the full assessment as you described
19 here earlier or do you do a partial assessment or-- how
20 about this. Tell me what assessment you would do before
21 immobilizing someone. Let's make it easy.
22     BY MR. MILLER: Objection. She has
23 answered this at least two or three times.
24     BY MR. COLLINS: Are you instructing her
25 not to answer?