
Eastern District of Kentucky
**F I L E D**
MAY 0 4 2018
AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

APPALCHIAN REGIONAL
HEALTHCARE, INC.,

    Plaintiff,

V.

U.S. NURSING CORPORATION,

    Defendant.

CIVIL ACTION NO. 7:14-122-KKC-EBA

OPINION AND ORDER

\*\*\* \*\*\* \*\*\*

This matter is before the Court on two motions for summary judgment (DE 190, 191) filed by the defendant U.S. Nursing Corporation.

## I. Background

With this action, plaintiff Appalachian Regional Healthcare, Inc. primarily seeks reimbursement for the costs it incurred in defending and settling an action against it in Letcher Circuit Court.

The state-court action was brought in 2008 by Ralph Profitt and his wife after Ralph suffered a severe spinal-cord injury while he was working at a sawmill in Whitesburg, Kentucky. (DE 189, Statement at 1.) At the time of the injury, Profitt was attempting to repair a piece of sawmill equipment. After the injury, Profitt's co-employees drove him in a pickup truck to a hospital in Whitesburg operated by Appalachian where he was treated. Profitt is now paralyzed from the waist down. (DE 189, Statement at 1-2.)

At the time, certain members of Appalachian's nursing staff were on strike. (DE 52, Compl., ¶ 9, Ex. A.) To replace its striking staff, Appalachian entered into a staffing agreement with defendant U.S. Nursing Corporation, which agreed to provide temporary

personnel to fill the vacant nursing positions. (DE 52, Compl., Ex. A, Agreement.) One of the nurses who U.S. Nursing provided was Constance Foote. She was on duty at Appalachian's emergency room when Proffitt arrived at the hospital.

After being treated at the hospital, Profitt and his wife brought suit in state court, initially asserting claims against the manufacturer and installer of the equipment and Appalachian. (DE 197-1, Original Compl.) Later, the Profitts amended the complaint to add as defendants U.S. Nursing and three nurses: Nurses Foote, Sheila Hurt, and Roxanna Parsons. (DE 65-2, First Am. State Ct. Compl.) The Profitts alleged that the three nurses "failed to stabilize and immobilize" Ralph when moving him from the pickup to the emergency room, which worsened his injuries. (DE 65-2, First Am. State Court Compl., ¶16.) Nurses Hurt and Parsons are regularly employed by Appalachian.

The Profitts asserted in the state-court action that Appalachian was vicariously liable for the actions of Hurt, Parsons, and Foote and that U.S. Nursing was vicariously liable for Foote's actions. (DE 25-1, Second Am. State Ct. Complaint, ¶¶ 27-28.) The Profitts also asserted that Appalachian was directly liable for Profitt's injuries because it negligently staffed the hospital and negligently trained the hospital staff. (DE 25-1, State Ct. Compl. ¶¶ 30-31.) According to Appalachian, the Profitts sought compensatory damages of $23.5 million and additional punitive damages. (DE 208, Statement at 2.)

In 2012 – about four years after the Profitt litigation began – U.S. Nursing asked the state court to find that Nurse Foote was Appalachian's "borrowed servant." As Judge Amul Thapar (who originally presided over this case) explained, "The borrowed-servant doctrine applies when an employer loans his employee to a third-party and that third-party directs the employee's work." (DE 30, Opinion at 2.) Under this doctrine, the third party is liable as an employer for the employee's actions and the original employer is relieved of all such

2

liabilities. (DE 30, Op. at 2). *See also Carnes v. Dep't of Econ. Sec.*, 435 S.W.2d 758, 761 (Ky. 1968). In this case, a finding in the state-court action that Nurse Foot was Appalachian's borrowed servant would have meant that Appalachian would be liable for Nurse Foote's alleged torts and U.S. Nursing would not be.

That obviously concerned Appalachian. It notified U.S. Nursing that it considered the borrowed-servant motion to be a breach of the staffing agreement. Appalachian threatened a breach-of-contract claim unless U.S. Nursing would agree to certain things. (DE 1-3, Letter.) It asked U.S. Nursing to agree that it remained obligated under the staffing agreement to indemnify Appalachian for any expenses it incurred as a result of Nurse Foote's actions no matter whether its borrowed-servant defense was successful or not. It also asked U.S. Nursing to agree that its insurance would cover any verdict against Appalachian that was based on Nurse Foote's acts even if the state court were to determine she was Appalachian's borrowed servant.

In response, U.S. Nursing informed Appalachian that it had conferred with its professional liability insurer, Nautilus Insurance Company. (DE 1-4, Letter.) Based on that discussion, U.S. Nursing had determined that, even if the trial court were to find that Nurse Foote was Appalachian's employee at the time of the incident under the borrowed-servant doctrine, the insurance would still cover her acts. U.S. Nursing conceded, however, that it could not make any representations on Nautilus's behalf. U.S. Nursing also informed Appalachian that Nautilus would not enter into any agreement with Appalachian confirming that the insurance would cover Nurse Foote's acts. U.S. Nursing clarified that its representations regarding the available coverage were based only on its understanding of the Nautilus insurance policy. As to its indemnification obligations, U.S. Nursing agreed to indemnify Appalachian from any damages arising from the negligent acts of Nurse Foote.

3

Finally, U.S. Nursing reserved its right to raise the borrowed-servant issue again at trial and to appeal any denial of its motion.

A few months later, the trial judge orally denied U.S. Nursing's borrowed-servant motion, stating that he viewed Nurse Foote as "dual serving." (DE 208-31, Tr. at 58-59.) The state court eventually granted Appalachian summary judgment on all claims against it except for the claim of vicarious liability for the negligent actions of Nurse Foote. (DE 197-16, Nov. 13, 2015 Order (summ. j. on negligent training and staffing claims); DE 206-8 Jan. 10, 2014 Order (summ. j. for all acts inside the emergency room.))

Likewise, the court entered summary judgment in favor of Appalachian's nurses Hurt and Parsons. (DE 208-13, Aug. 23, 2012 Order.) The trial judge also entered an order prohibiting any party from arguing or introducing evidence that Nurse Hurt or Parsons was the individual who came out of the emergency room to assist Profitt with entering the hospital. The trial judge determined that all parties had an opportunity to respond to the motions for summary judgment filed by Nurses Hurt and Parsons and that U.S. Nursing filed no response. Accordingly, the trial judge found that the liability of the two nurses had been litigated and resolved and was no longer an issue for the jury to decide. (DE 208-11, Mar. 26, 2016 Order.)

The manufacturer and installer of the equipment settled with the Profitts for around $3 million. (DE 189, Statement at 10; DE 208, Statement at 5.) That left as defendants Appalachian, U.S. Nursing, and Nurse Foote.

On April 1, 2016 – the last business day before trial was scheduled to begin – Appalachian settled with the Profitts for $2 million. At this point, it had incurred legal fees of $1 million defending the claims against it. (DE 208, Statement at 3.) Appalachian asserts that, at that time, the "only conceivable basis" for its liability was its vicarious liability for

4

Nurse Foote's actions. (DE 208, Statement at 8.) On the same day, U.S. Nursing separately settled with the Profitts for $1.1 million. (DE 208, Statement at 3.)

There is no dispute that U.S. Nursing did not defend Appalachian in the state-court action. Nor is there any dispute that U.S. Nursing has not indemnified Appalachian for any costs it incurred in settling or defending the Profitts' action against it. That is what brings Appalachian to this Court.

In its complaint, Appalachian asserts four claims: 1) a claim that U.S. Nursing breached the staffing agreement by failing to defend it in the Profitt litigation (Count I); 2) a claim that U.S. Nursing breached the staffing agreement by failing to indemnify it for the costs it incurred in defending and settling the Profitt litigation (Count II); 3) a claim that U.S. Nursing breached the implied covenant of good faith and fair dealing that applied to its "contractual obligation to maintain and provide proof of insurance coverage for malpractice claims for the acts of [U.S. Nursing] employees supplied to" Appalachian (Count III); and 4) a claim for "common law indemnity" (Count IV).

Appalachian voluntarily dismissed its common-law indemnity claim. U.S. Nursing has filed two motions for summary judgment, which together ask the Court to rule in its favor on the three remaining claims. The first motion asks the Court to rule in its favor on Appalachian's indemnity claim. (DE 190, Motion.) U.S. Nursing's second motion asks the Court to rule in its favor on the claims for breach of duty to defend and for breach of its obligation to procure malpractice liability insurance. (DE 191, Motion.)

## II.    U.S. Nursing's first motion for summary judgment (DE 190)

U.S. Nursing's first motion asks the Court to rule that it did not breach its indemnification obligations. As noted, this case was originally assigned to Judge Thapar. In

5

a prior ruling, he set out what Appalachian must prove to prevail on its indemnification claim. (DE 77, Nov. 3, 2016 Order.)

Judge Thapar ruled that Appalachian does not have to show that it was actually liable to Profitt for his injuries. In reaching that conclusion, he looked at the language of the indemnification provision. That provision requires U.S. Nursing to indemnify Appalachian for "any and all liability or damages that arises from . . . the negligent or intentional act or omission" of U.S. Nursing or its employees. (DE 52-1, Staffing Agreement, § D(15).)

Judge Thapar determined the clause requires Appalachian to prove three things. First, it must prove that a U.S. Nursing employee conducted a "negligent or intentional act or omission." That means it must prove that Nurse Foote was the person who removed Profitt from the truck and took him into the emergency room. It also must show that her acts were "intentional" or "negligent." Judge Thapar ruled that, if Appalachian intends to show the acts were negligent, it must prove that Nurse Foote's actions "created an unreasonable risk of harm" to Profitt – that she breached the standard of care. It does not, however, have to prove the other elements of Profitt's negligence claim against it. It does not have to prove that Nurse Foote's acts caused Profitt's damages. It just has to show she committed a negligent act.

If, on the other hand, Appalachian intends to prove Nurse Foote's actions were "intentional," it must prove that she intentionally committed an act that gave rise to Appalachian's liability or damages. This means that Appalachian must prove more than simply Nurse Foote intended to place Profitt in the wheelchair. It must prove that she intended to do that act "in a way that could cause liability or damage" to Appalachian. (DE 77, Nov. 3, 2016 Order at 6.)

6

Second, Appalachian must show it suffered liability or damage. This means it must present proof of its litigation and settlement costs in the state-court action. (AR 77, Nov. 3, 2016 Order Order at 7-8.)

Finally, Appalachian must prove that Nurse Foote's actions caused – or "directly produced" – Appalachian's damages. (DE 77, Nov. 3, 2016 Order at 8.) Again, Judge Thapar determined that Appalachian does not have to prove that Nurse Foote's acts caused *Profitt's* damages. It only has to prove that her acts caused *Appalachian's* damages. (DE 77, Nov. 3, 2016 Order at 8-9.)

With its first motion for summary judgment, U.S. Nursing argues that it has no obligation to indemnify Appalachian for two reasons. First, it argues that Appalachian's settlement with the Profitts settled a claim based on the negligence of an unidentified nurse who was not even employed by U.S. Nursing. Second, U.S. Nursing argues the settlement was "unreasonable" as a matter of law.

As to the first argument, there is no dispute that the staffing agreement requires U.S. Nursing to indemnify Appalachian only for the negligence of *U.S. Nursing's* employees. (DE 52-1, Staffing Agreement, § D(15).) U.S. Nursing argues that Appalachian's $2 million payment to the Profitts settled a claim that Appalachian was vicariously liable for negligent acts performed by an unidentified member of Appalachian's regular nursing staff, who removed Profitt from his pickup and moved him into the emergency room. (DE 190-1, Mem. at 10.)

In response to the Court's order, Appalachian has now filed a copy of the settlement agreement in the record. (DE 282-1, Settlement Agreement.) The settlement agreement is broad. With it, the Profitts agreed to release Appalachian from "any and all liability" for any and all claims, demands, injuries, or actions related to the incident. The release

7

operated as a "complete bar against further prosecution of" the Profitt litigation against Appalachian. (DE 282-1, Settlement, ¶8.) The Profitts agreed that the settlement payment was in "full accord and satisfaction" of "all the claims asserted by them" against Appalachian in the state-court action. (DE 282-1, Settlement, ¶10.)

The Court has reviewed the complaint in the state-court action to determine whether it can fairly be read to assert a claim that Appalachian was vicariously liable for the actions of an unidentified nurse who was a member of Appalachian's regular staff and who moved Profitt into the emergency room. If so, then the settlement agreement covered that claim. If not, then the settlement agreement did not cover any claim based on the conduct of a fourth nurse.

The Profitts made allegations about only three nurses in their most recent state-court complaint: Nurses Foote, Hurt and Parsons. They alleged that Hurt and Parsons were employed by Appalachian and that Foote was employed by Appalachian and U.S. Nursing. (DE 25-1, Amended Complaint ¶¶ 8-10.) They alleged that all three nurses "failed to stabilize and immobilize" Profitt and that their failure to do so "exacerbated and made worse" his injuries. (DE 25-1, Am. Compl. ¶ 24.)

As to the vicarious-liability claim against Appalachian, the Profitts asserted that Appalachian was vicariously liable for the acts of only Hurt, Parsons, and Foote. (DE 25-1, Amended Compl. ¶ 27.)

The Profitts did not name or even make any allegations about wrongful conduct by any other nurse or any other Appalachian employee. U.S. Nursing recognizes this but argues that, in their *original* complaint in state court, the Profitts asserted a claim against Appalachian based on the conduct of a fourth unknown nurse. U.S. Nursing argues that claim remained effective even after the Profitts filed an amended complaint.

8

The Profitts' original complaint did not assert claims against any nurses at all but did assert claims against Appalachian, alleging that Appalachian itself "failed to stabilize and immobilize" Profitt. (DE 65-2, Original Compl. ¶ 17.) U.S. Nursing argues that this claim remained viable because, in their most recent amended complaint in state court, the Profitts adopted and realleged "each and every allegation" in the original complaint. (DE 25-1, Amended Compl. ¶ 1; DE 190-1, Mem. at 6 & n.4.)

The Profitts obviously could not and did not assert a claim that Appalachian itself failed to stabilize and mobilize Profitt when he was moved him from the pickup to the emergency room. Appalachian is an entity and, as the Profitts recognized in their original complaint, it can only act through its "agents, servants and/or employees." (DE 190-2, Original Compl. ¶ 16.) The original complaint named no such employees, agents or servants. The amended complaint did and, as discussed, it made allegations against only Nurses Foote, Parsons, and Hurt. The complaint cannot be fairly read to put Appalachian on notice of a claim against it based on the conduct of any other employee. *See Roberts v. Conley*, 626 S.W.2d 634, 639 (Ky. 1981) ("The principal objective of a pleading is to give to the opposing party fair notice of the essential nature of the claim presented and the type of relief to which claimant deems himself entitled.")

U.S. Nursing argues that Appalachian did, in fact, believe at the time of the settlement that the Profitts asserted a claim against Appalachian based on the conduct of a fourth nurse. For this argument, U.S. Nursing cites the deposition testimony of Appalachian's General Counsel Rick King. (DE 190-1, Mem. at 6.) In the portion of the deposition testimony cited, however, King simply recognizes the wording of the Profitts' original and amended complaints. (DE 190-1, Mem. at 6; DE 190-4, King Dep. at 79-81.) He also testifies that *if* U.S. Nursing were to present evidence at trial that it was some other female besides

Nurse Foote who moved Profitt, and *if* the jury were to determine that it was an Appalachian employee who moved Profitt from the pickup, *then* Appalachian would be 100 percent liable for the verdict. (DE 190-1, Mem. at 6; DE 190-4, King Dep. at 179.) He merely recognized that, under that hypothetical scenario, Appalachian would be vicariously liable for the conduct of its own employee. King did not state that scenario was presented in this case. (DE 190-4, King Dep. at 179.)

Profitt's state-court complaint cannot be read to assert a claim that Appalachian is liable for the conduct of a fourth unidentified nurse. Accordingly, the settlement did not cover such a claim.

U.S. Nursing also argues that the settlement covered other claims against Appalachian itself: claims for negligent staffing and training and claims based on the care Profitt received after he was moved inside the emergency room. (DE 190-1, Mem. at 10.) Appalachian points out that, by the time it settled with the Profitts, the trial court had dismissed each of these claims and the claims against Nurses Hurt and Parsons. Further, Appalachian notes that the trial court had ruled that U.S. Nursing could not even argue to the jury that either Nurse Parsons or Nurse Hurt had transported Profitt from the pickup to the emergency room. (DE 208-11, Mar. 26, 2016 Order; DE 208-13, Aug. 23, 2012 Order.) Thus, by the time of the settlement, the state court had dismissed every claim against Appalachian except the claim that it was vicariously liable for the acts of Nurse Foote. That was the only claim remaining for trial.

The settlement agreement, however, does cover the dismissed claims. As discussed, the settlement agreement is broad. With it, the Profitts agreed to release Appalachian from "any and all liability" for any and all claims, demands, injuries, or actions related to the incident. The release operated as a "complete bar against further prosecution of" the Profitt

10

litigation against Appalachian. (DE 282-1, Settlement, ¶8.) The Profitts agreed that the settlement payment was in "full accord and satisfaction" of "all the claims asserted by them" against Appalachian in the state-court action. (DE 282-1, Settlement, ¶10.) Without the settlement agreement, the Profitts could have appealed the dismissed claims.

Nevertheless, a factual issue remains as to what amount of the settlement should be reasonably apportioned to the claim based on Nurse Foote's conduct. This is an objective inquiry: the question for the jury is how a reasonable person in Appalachian's position would have allocated the $2 million settlement between the claims based on Nurse Foote's actions and the other claims against Appalachian at the time the settlement was reached and in light of the information available to Appalachian at that time. *UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 47 F. Supp. 3d 863, 872 (D. Minn. 2014), *aff'd sub nom. UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017).

As to U.S. Nursing's second argument – that it is not obligated to indemnify Appalachian because the settlement with the Profitts was unreasonable as a matter of law, "[t]he reasonableness of the settlement consists of two components, which are interrelated." *Grand Trunk W. R.R. v. Auto Warehousing Co.*, 686 N.W.2d 756, 764 (Mich. App. 2004)(quoting *Trim v. Clark Equip. Co.*, 274 N.W.2d 33, 35 (Mich. App. 1978)). The first factor is the amount paid to settle the claim and the second is the payor's risk of exposure. *Id.* The risk of exposure is the "probable amount of a judgment . . . balanced against the possibility that the . . . defendant would have prevailed." *Id.* This, again, is an objective standard, which asks what a reasonably prudent person in the settling party's shoes would have settled for given the merits of the underlying claim apparent at the time of settlement. (DE 159, May 31, 2017 Order at 7.)

11

U.S. Nursing first argues that the settlement was unreasonable because Appalachian did not perform sufficient research regarding possible verdicts before paying the Profitts the $2 million. (DE 190-1, Mem. at 5.) This may be true but it is irrelevant to determining the *objective* reasonableness of the settlement. Neither this Court nor a jury need consider the actual research undertaken by Appalachian before it settled. The question is what a reasonably prudent person would have paid to settle the claim.

Next, U.S. Nursing argues that the $2 million settlement was unreasonable because Appalachian did not face the prospect of having to pay the Profitts anything even if they prevailed at trial. U.S. Nursing argues that Appalachian's own counsel had concluded that the Profitts' maximum likely verdict against it was $4.5 million. Further, U.S. Nursing argues, Appalachian knew that U.S. Nursing's Nautilus insurance policy would cover any verdict up to $5 million. U.S. Nursing argues that paying $2 million to settle the Profitts' claims when, at trial, "the risk of exposure was $0 is unreasonable as a matter of law." (DE 190-1, Mem. at 6.)

Even assuming that Appalachian had definitively and reasonably valued the Profitts' claim at below $5 million, Appalachian reasonably determined that it was uncertain whether Nautilus would pay for any verdict that was based on Nurse Foote's actions. It is true the trial court had denied U.S. Nursing's motion asking the Court to find as a matter of law that Appalachian was liable for Nurse Foote's actions under the borrowed-servant doctrine. Nevertheless, it was reasonable to believe that U.S. Nursing would raise the issue again at trial. It had explicitly stated that it reserved its right to do so and also to appeal the trial court's ruling on the issue. (DE 1-4, Letter.) Further, Appalachian asserts that Nurse Foote's status as either its borrowed servant or as a dual servant of Appalachian and

12

U.S. Nursing triggered certain exclusions in the insurance coverage that will be explained further below. The Court cannot find that assertion is unreasonable as a matter of law.

The insurer Nautilus had never represented to Appalachian that its policy would cover damages arising from Nurse Foote's actions if a factfinder were to determine that Appalachian and not U.S. Nursing was liable for her conduct. In fact, Nautilus had refused to make any assurances or representations to that effect. (DE 1-4, Letter.) U.S. Nursing explicitly denied that it could make any representations on Nautilus's behalf and it cautioned Appalachian that its representations regarding the available coverage were based only on U.S. Nursing's understanding of the Nautilus insurance policy. (DE 1-4, Letter.) The Court cannot find it unreasonable as a matter of law that Appalachian did not rely on that "understanding" when settling with the Profitts.

Finally, U.S. Nursing argues that Appalachian's settlement was unreasonable because it was the product of fraud and collusion with the Profitts. Here, U.S. Nursing again argues that the settlement agreement covered claims that were not based on Nurse Foote's conduct. (DE 190-1, Mem. at 14-15; DE 215, Reply at 3.) The simple fact that the settlement agreement included claims that are not covered by the indemnification agreement does not on its own constitute fraud.

U.S. Nursing also argues that the settlement agreement was collusive because it required the Profitts to help Appalachian in an indemnity claim against U.S. Nursing. The Court finds no such provision in the settlement agreement. U.S. Nursing also argues the settlement was collusive because it required that, if the Profitts' claim against Foote proceeded to trial, they must oppose any jury instruction that would apportion fault to Appalachian for Profitt's injuries. (DE 190-1, Mem. at 14-15; DE 215, Reply at 3; DE 282-1, Agreement, ¶16.) Issues of fraud and collusion in a settlement agreement, however,

13

generally present fact questions, not subject to summary judgment. *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 535 (Iowa 1995).

Accordingly, this Court cannot find as a matter of law that the $2 million settlement payment by Appalachian was unreasonable. For these reasons, U.S. Nursing's first motion for summary judgment will be denied.

### III. U.S. Nursing's Second Motion for Summary Judgment (DE 191)

With its second motion for summary judgment, U.S. Nursing asks the Court to rule as a matter of law that it did not breach the duty to defend Appalachian (Count I) and did not breach its obligation to procure malpractice insurance (Count III).

As to its duty to defend, U.S. Nursing argues that its obligation to defend Appalachian was never triggered because Appalachian did not "tender a request for defense." (DE 191-1, Mem. at 5.) U.S. Nursing does not explain exactly what is required for such a tender under Kentucky law. The staffing agreement does not require that Appalachian "tender a request for defense" or otherwise notify U.S. Nursing of any action that falls within the coverage of the duty to defend. It simply provides that U.S. Nursing "shall . . . defend. . . [Appalachian] for any and all liability that arises from . . . the negligent or intentional act or omission" of U.S. Nursing, including its staff members assigned to Appalachian. (DE 52-1, Staffing Agreement § D(15).) Thus, it does not specify what, if any, kind of notice one party was required to provide the other in order to trigger the duty to defend.

U.S. Nursing cites cases from other jurisdictions holding that an insurer has no duty to defend unless it is requested to do so. (DE 191-1, Mem. at 5.) But U.S. Nursing does not cite any case holding that a formal tendering of a defense is required outside of the insurance context under the circumstances that exist in this case. Again, the agreement to defend in this case was a mutual agreement between two sophisticated corporations. It contained no

14

requirement that either party tender the defense of an action to the other in order to trigger the duty to defend. Further, U.S. Nursing was a party to the Profitt lawsuit. It had actual notice of all the claims against Appalachian and had taken the position that it had no duty to defend or indemnify Appalachian for the claim based on Nurse Foote's conduct until the Profitt litigation was complete and the jury had determined whether Nurse Foote was the person who wheeled Profitt into the emergency room. (DE 204-1, Sept. 23, 2014 Letter; DE 204-3, Mar. 11, 2011 Letter.) U.S. Nursing was also aware that Appalachian had necessarily hired its own counsel to defend it in the Profitt litigation.

The Court need not determine, however, whether, under Kentucky law, the staffing agreement required that Appalachian formally tender defense of the Profitt litigation to U.S. Nursing because the outcome is the same even if it does: assuming Appalachian is able to prove that U.S. Nursing had a duty to defend it, Appalachian is entitled to reimbursement of its reasonable legal fees and costs.

Whatever qualifies as "tendering a defense" under Kentucky law, it is clear that U.S. Nursing understood that Appalachian did indeed tender defense of the Profitt litigation to it. In a letter dated March 8, 2011, U.S. Nursing states that its counsel will respond to Appalachian's prior "tender of defense." (DE 204-2, Mar. 8, 2011 Letter.) Thus, U.S. Nursing believed that Appalachian had tendered defense of the Profitt litigation to it. The Court recognizes that Appalachian itself takes the position that this was a "mistaken" impression by U.S. Nursing. (DE 204, Response at 4, n.4.) Regardless, it is clear that, at least by March 2011, U.S. Nursing had actual notice of the claims against Appalachian and also that U.S. Nursing believed Appalachian had tendered defense of the claims to it.

Under Kentucky law, U.S. Nursing had a "duty to defend if there is any allegation which potentially, possibly or might come within the coverage of the policy." *James Graham*

15

*Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991). Again, U.S. Nursing took the position that it had no duty to defend the claim against Appalachian based on Nurse Foote's conduct until the Profitt litigation was complete and the jury had determined whether Nurse Foote was the person who wheeled Profitt into the emergency room. (DE 204-1, Sept. 23, 2014 Letter; DE 204-3, Mar. 11, 2011 Letter.)

Having made that determination, U.S. Nursing had a couple of options. It could "defend the claim anyway, while preserving by a reservation of rights letter its right to challenge the coverage at a later date." *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005). This is the preferred option. *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 652 (6th Cir. 2013).

Another option is the one U.S. Nursing took: elect not to defend. *Aetna*, 179 S.W.3d at 841. With this option, U.S. Nursing risked being held in breach of the duty to defend, which would make it liable for "'all damages naturally flowing from' the failure to provide a defense." *Id.* (quoting *Eskridge v. Educator and Executive Insurers, Inc.*, 677 S.W.2d 887 (Ky.1984)). "This includes 'damages' for reimbursement of defense costs and expenses if the insured hires his own lawyer." *Id.* "[I]nsurers that breach their duty to defend are liable to their insureds for reasonable defense costs incurred." *The Point/Arc of N. Kentucky, Inc. v. Philadelphia Indem. Ins. Co.*, 154 F. Supp. 3d 503, 515 (E.D. Ky. 2015) "The proper amount of defense costs is an issue that must be determined by a jury." *Id.*

A remaining issue is what, if any, defense costs Appalachian may recoup for the time *prior to* the tendering of the defense. The Profitt litigation commenced in 2008. It appears that U.S. Nursing understood that Appalachian tendered the defense to it around the time of the March 8, 2011 letter. (DE 204-2, Mar. 8, 2011 Letter.) In the insurance context, with regard to an insurance contract that contained an express notice requirement, the

Kentucky Supreme Court has held that, where the insured failed to comply with the notice requirement, the insurer is still obligated to defend "unless the insurer can show that it was prejudiced by the act of the insured." *Jones v. Bituminous Cas. Corp.*, 821 S.W.2d 798, 801 (Ky. 1991).

U.S. Nursing argues that this holding should not apply outside of the insurance context. But U.S. Nursing itself relies on cases in the insurance context to argue that Appalachian had an obligation to tender a defense in the first place. It argues that, even though the staffing agreement contained no notice requirement, Appalachian had the same duty to tender a defense as the insureds in the cases it relies on. If so, the Court sees no reason U.S. Nursing would not have an insurer's obligation to prove prejudice from Appalachian's failure to tender its defense. This is especially true here where U.S. Nursing was aware of the lawsuit and had taken the position that its duty to defend and indemnify was not triggered until a jury verdict was reached.

U.S. Nursing's showing of prejudice will most likely consist of proof that Appalachian's attorneys' fees and costs were not reasonable.

Accordingly, U.S. Nursing's motion for summary judgment on the claim that it breached the duty to defend will be denied.

As to Appalachian's argument regarding U.S. Nursing's duty to obtain malpractice insurance, the policy states:

> [U.S. Nursing] shall maintain and provide evidence of malpractice insurance for staff working at [Appalachian] for coverage of $1,000,000 per occurrence and $3,000,000 in annual aggregate. . . Also Corporation maintains an umbrella insurance policy for supplemental coverage up to $4,000,000. A current certificate of insurance shall be provided to [Appalachian] upon request.

(DE 52-1 Staffing Agreement, §A(11).)

Appalachian has argued in a prior pleading that this provision must be read to require U.S. Nursing to buy insurance that would cover its obligation to indemnify Appalachian for any damages caused by U.S. Nursing's own employees, like Nurse Foote. (DE 124, Objections at 8-9.) Appalachian argued that U.S. Nursing breached this provision by two actions: by buying insurance with certain exclusions and then by taking action that triggered those exclusions so that the insurance would not cover the damages caused by Nurse Foote's negligent acts. (DE 124, Obj. at 5.)

The first such exclusion in the Nautilous insurance policy stated the insurance would not apply to damages that U.S. Nursing became liable for solely under an indemnity agreement. The second exclusion stated the insurance would not apply to liability claims against U.S. Nursing employees if any other insurance covered the claims.

As to what actions U.S. Nursing took to trigger the applicability of those exclusions, Appalachian has argued that it was the filing of the borrowed-servant motion by which U.S. Nursing sought a ruling that it was not vicariously liable for Nurse Foote's actions and that Appalachian was. (DE 124, Obj. at 9.) Appalachian argued that, if this motion had been successful, then Nautilus would argue the insurance does not apply pursuant to both exclusions. First, if Appalachian were responsible for Nurse Foote's actions, U.S. Nursing would have been liable for her conduct only because of the indemnity agreement. Second, Nautilus would argue that Appalachian's own insurance should cover the damages, not U.S. Nursing's. (DE 124, Obj. at 5.)

This Court, however, rejected Appalachian's argument and held that nothing in the staffing agreement "required U.S. Nursing to maintain insurance 'without exclusions.'" (DE 159, Order at 5.) The Court found that the parties "dealt with insurance in only one paragraph, which requires only two things from U.S. Nursing: to 'maintain and provide

18

evidence of malpractice insurance for staff working at [Appalachian],' and to keep handy a 'current certificate of insurance.'" (DE 159, Order at 5.)

The Court recognizes that, in its complaint, Appalachian does not assert that U.S. Nursing breached any *express* provisions of the contract regarding the procurement of insurance. Instead, it asserts that U.S. Nursing breached the *implied* covenant of good faith and fair dealing that applied to its "contractual obligation to maintain and provide proof of insurance coverage for malpractice claims for the acts of [U.S. Nursing] employees supplied to" Appalachian. (DE 52, Am. Compl., Count III).

In its response pleading filed on this motion, Appalachian states this "claim [is] based on [U.S. Nursing's] failing to perform in good faith its obligations under the" staffing agreement to "procure insurance to cover" the Profitts' claims against Appalachian based on Nurse Foote's conduct. (DE 204, Resp. at 1.) It argues that U.S. Nursing breached this duty by "either procuring insurance which did not provide the intended coverage or engaging in conduct which defeated such coverage." (DE 204, Resp. at 1.) It further states that U.S. Nursing had an obligation to procure liability insurance "in good faith, and not to take actions which would undermine the protection that [Appalachian] had bargained for." (DE 204, Resp. at 7.)

It is true that, under Kentucky law, "[w]ithin every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Tr. Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). The covenant require parties to "exercise their existing contractual rights and duties fairly and in good faith, but it does not impose any new contractual duties upon the parties apart from the obligation to perform existing duties fairly and in good faith." *Kinzel v. Bank of Am.*, 850 F.3d 275, 283

19

(6th Cir. 2017). *See also MERV Properties, LLC v. Eric Friedlander(In re Eric Friedlander)*, No. 11-52814, 2014 WL 801509, at *5 (Bankr. E.D. Ky. Feb. 27, 2014); *Goot v. Metro. Gov't of Nashville & Davidson Cty.*, No. M200302013COAR3CV, 2005 WL 3031638, at *7 & n.17 (Tenn. Ct. App. Nov. 9, 2005) (citing cases).

To the extent that Appalachian argues that U.S. Nursing did not carry out in good faith an obligation to procure insurance without exclusions, the Court continues to find that there is no such obligation under the agreement. As to Appalachian's claim that U.S. Nursing did not carry out in good faith its obligation to buy insurance that would actually cover the conduct of its staff, Appalachian points out that, after the state court found that Nurse Foote was "dual serving," Nautilus indicated in an e-mail to U.S. Nursing that Appalachian's insurance should cover Nurse Foote's actions instead of the Nautilus insurance. (DE 204, Resp. at 9; DE 204-15, e-mails.)

Appalachian also states that Nautilus communicated this position to it "on numerous occasions" throughout the Profitt litigation. (DE 208, Statement at 15.) It points to a September 9, 2014 e-mail in which a Nautilus representative stated to an Appalachian representative that, "Nautilus believes that Nurse Foote also may be an insured or other beneficiary under professional liability insurance issued to [Appalachian] or self-funded liability insurance trusts created by" Appalachian. (DE 208-35, Sept. 9, 2014 e-mail.) On January 21, 2016, Appalachian's director of claims management attended a meeting during which Nautilus's representatives indicated that $5 million of coverage would not be available under the Nautilus policy if Nurse Foote were found negligent in the Profitt litigation. (DE 208-36, Caudill Aff.) Appalachian states that it repeatedly sought assurances from U.S. Nursing that the Nautilus policy would cover Nurse Foote's acts but that U.S. Nursing was unable to provide such assurances. (DE 208, Statement at 16, 18.)

Appalachian itself recognizes, however, that by June 2, 2015, U.S. Nursing had obtained Nautilus's agreement to waive the indemnity exclusion in the policy. (DE 208, Statement at 18; DE 204, Resp. at 10.) Appalachian recognizes that U.S. Nursing "insisted" upon the waiver to ensure that Nautilus would not claim that its coverage was secondary to Appalachian's. (DE 208, Statement at 18.) According to Appalachian, this meant that Appalachian "was afforded the coverage it sought for any verdict against Foote up to $5 million." (DE 208, Statement at 18.)

That would seem to resolve the matter. U.S. Nursing did buy insurance and that insurance did provide sufficient coverage for the negligent acts of its own staff, including Nurse Foote. Further, at U.S. Nursing's insistence and prodding, Nautilus eventually made it clear that its policy would cover any verdict based on Nurse Foote's actions, up to $5 million. Thus, U.S. Nursing could not have breached any good-faith obligations with regard to its duty to procure insurance that would cover the negligent acts of its staff at Appalachian.

Appalachian has another complaint, however. It complains that U.S. Nursing did not timely inform it that Nautilus had agreed to cover Nurse Foote's actions. (DE 208, Statement at 19.) Thus, Appalachian still believed when it settled with the Profitts on April 1, 2016 that the Nautilus coverage was in doubt. (DE 208, Statement at 19.) Appalachian argues that U.S. Nursing used Appalachian's uncertainty about the coverage in an attempt to coerce Appalachian into giving up its indemnification rights in return for U.S. Nursing's cooperation in the settlement with the Profitts. (DE 204, Resp. at 11.)

Again, however, the duty of good faith and fair dealing cannot create any new obligations or rights under a contract. Appalachian's complaint that U.S. Nursing did not timely inform it of its insurer's agreement to cover Nurse Foote's acts is not tied to any

21

obligation in the contract. The contract does not in any way require U.S. Nursing to inform Appalachian of its negotiations or communications with its insurer.

Appalachian may have been reasonably worried about the availability of insurance to cover any verdict against it and that may be a factor in determining the reasonableness of its settlement with the Profitts. Nevertheless, U.S. Nursing had no obligation under the staffing agreement to keep Appalachian apprised of its communications with its insurer. Accordingly, it cannot be liable for failing to carry out that obligation in good faith.

For these reasons, the Court will grant U.S. Nursing's motion for summary judgment on Appalachian's claim that U.S. Nursing breached the covenant of good faith and fair dealing contained in the staffing agreement.

## IV.    Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) U.S. Nursing's motion for summary judgment (DE 190) on Appalachian's contractual indemnity claim (Count II) is DENIED;

2) U.S. Nursing's motion for summary judgment (DE 191) is GRANTED in part and DENIED in part as follows:

   a. The motion is GRANTED as to Appalachian's claim for breach of the duty of good faith and fair dealing in procuring insurance (Count III) and that claim is DISMISSED; and

   b. The motion is DENIED as to Appalachian's claim for breach of the duty to defend (Count I).

This 4th day of May, 2018



Signed By:
Karen K. Caldwell
United States District Judge