UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| APPALACHIAN REGIONAL HEALTHCARE, INC., | CIVIL NO. 7:14-122-KKC-EBA |
| Plaintiff, | |
| V. | OPINION AND ORDER |
| U.S. NURSING CORPORATION, | |
| Defendant. | |

\*\*\*\*\*\*\*\*

With this action, Appalachian Regional Healthcare, Inc. has been seeking indemnification for the amounts it expended to defend and settle a state court action that was filed against it in 2008. After a trial in this Court on the indemnification claim, a jury ruled in Appalachian's favor. The case is now before the Court on remand from the United States Court of Appeals for the Sixth Circuit to determine if an error in one of the Court's evidentiary rulings requires a new trial. *See Appalachian Reg'l Healthcare, Inc. v. U.S. Nursing Corp.*, 824 F. App'x 360, 370 (6th Cir. 2020). The Court concludes it does not.

\* \* \*

Appalachian provides medical services in Eastern Kentucky, including at its hospital located in Whitesburg, Kentucky. Defendant U.S. Nursing Corporation is a staffing agency that provided nurses to Appalachian on a temporary basis when Appalachian was short-staffed. The staffing agreement between the parties required U.S. Nursing to indemnify Appalachian from "any and all liability or damage that arises

from . . . the negligent or intentional act or omission" of U.S. Nursing or its employees. (DE 52-1, Staffing Agreement, § D(15)).

The state court action that forms the basis for Appalachian's indemnification claim was filed by Ralph Profitt and his wife after Proffitt suffered a severe spinal cord injury while working at a sawmill in 2007. Some co-workers (David English and Ken Jaworski) drove Profitt in a pick-up truck from the workplace to a hospital in Whitesburg Kentucky that is operated by Appalachian. In the state court action, Profitt alleged that his injuries were worsened when a nurse moved him into the hospital emergency room ("ER") without stabilizing and immobilizing him. (DE 242-9, Amended Complaint.)

There was no dispute that the nurse who moved Profitt was female. Significant to this case, two nurses working at the hospital at the time of the incident – Sheila Hurt and Roxanna Parsons – were Appalachian employees. One nurse – Constance Foote – was a U.S. Nursing employee. These three nurses were the only female nurses in the ER on the night in question. (DE 380, U.S. Nursing Br. at 1; DE 383, U.S. Nursing Reply at 1.) If Nurse Foote was the nurse who moved Profitt into the ER, then, pursuant to the indemnification agreement, U.S. Nursing was potentially liable to Appalachian for the actions of its employee. If, on the other hand, Nurse Foote did not move Profitt, then U.S. Nursing could not possibly be liable to Appalachian.

In the state court action, there was never any real dispute about whether Nurse Foote was the nurse who moved Profitt. Profitt and his co-worker English were the only witnesses to the event who recalled the identity of the nurse. Both identified Nurse Foote. There was no argument or evidence in state court that either Hurt or Parsons was the nurse who moved Profitt into the ER. When Hurt and Parsons pointed that out to the state court in a motion for summary judgment (DE 239-7), no party objected to their

2

dismissal from the action or pointed to any evidence that either nurse was the one who moved Profitt. Thus, the state court granted both Appalachian nurses summary judgment. (DE 208-13, Aug. 23, 2012 Order.) A couple of weeks later, U.S. Nursing filed its own motion for summary judgment in the state court action arguing that it could not be liable for Nurse Foote's actions under Kentucky's borrowed-servant doctrine. (DE 1-2, Mot. for Summ. J.)

Years later, as the state court case progressed toward trial, the state court entered an order prohibiting any party from arguing or introducing evidence at trial that either Nurse Hurt or Parsons was the individual who moved Profitt into the ER. (DE 208-11, March 26, 2016 Order.) The state court noted that "all parties had an opportunity to respond to the motions for summary judgment filed on behalf of Hurt and Parsons" and that U.S. Nursing "chose not to do so." Thus, the state court determined that "[t]he liability of Hurt and Parsons has been litigated and resolved."

On the last business day before the state court trial was set to commence in 2016, both Appalachian and U.S. Nursing settled the claims against them. Appalachian paid the Profitts $2 million. It incurred legal fees and costs of $823,522.71 in the state court action. Appalachian demanded that U.S. Nursing indemnify it for those amounts. U.S. Nursing refused do so, which caused Appalachian to bring this claim in federal court against U.S. Nursing for breach of the indemnification provision of the staffing agreement.

* * *

As with the underlying state court action, prior to trial on the indemnification claim, this Court granted Appalachian's motion (DE 239) to exclude any argument or testimony at trial that Nurse Hurt or Parsons (the two Appalachian employees) moved Profitt from the truck into the ER. In its motion, Appalachian argued that the liability of

3

Nurses Hurt and Parsons had been resolved by the state court's summary judgment order and, thus, pursuant to the doctrine of issue preclusion, U.S. Nursing was barred from relitigating that issue. In response (DE 271) to Appalachian's motion, U.S. Nursing did not address the issue-preclusion argument. Instead, it argued that there was evidence that Nurse Foote did not move Profitt and that it was entitled to present that evidence at trial. (DE 271, Response at 4, 5.)

Appalachian's motion did not, however, ask the Court to prohibit U.S. Nursing from introducing any evidence at trial that *Nurse Foote did not* move Profitt. The issue raised by Appalachian's motion was whether U.S. Nursing could present evidence or argue that *Nurses Parsons or Hurt did* move Profitt. In its response to the motion, U.S. Nursing did not point to any such evidence regarding Nurse Parsons. As to Nurse Hurt, U.S. Nursing pointed only to two pieces of evidence: 1) Profitt's hospital chart contained Nurse Foote's name, initials, and handwriting, indicating she treated him after he was inside the ER; and 2) Profitt testified that the nurse who transported him into the ER later treated him. (DE 271, Response at 2.)

At a status conference just days before trial was set to begin, the Court asked U.S. Nursing directly, "what evidence do you have that it was either Nurse Hurt or Nurse Parsons" who moved Profitt. (DE 353, Tr. at 6799.) U.S. Nursing again pointed to the same two pieces of evidence discussed above, both of which only involved Nurse Hurt. It argued that 1) Profitt testified that the female who pushed him into the ER "stayed with me the entire time and performed all procedures," (DE 353, Tr. at 6800); and 2) Nurse Hurt's "name and initials are all over [Profitt's medical] chart." (DE 353, Tr. at 6799.)

U.S. Nursing pointed to no evidence involving Nurse Parsons, and U.S. Nursing's counsel made clear he intended to point the finger only at Nurse Hurt. He stated his

4

intent was to argue that "the testimony points to some nurse that was performing procedures on Mr. Profitt and stayed with Mr. Profitt the entire time he was there. . . I was planning to argue that Sheila Hurt's name is all over the chart. Sheila Hurt was the one that went back and performed all the procedures." (DE 353, Tr. at 6813.) The Court ultimately declined to reconsider its ruling precluding U.S. Nursing from producing this evidence at trial. (DE 321, 348.)

After a seven-day trial, the jury returned a verdict for Appalachian. The Court conducted the trial in two phases. In the first phase, the jury was asked to decide two issues by a preponderance of the evidence: 1) whether Nurse Foote was the female who helped move Profitt from the pick-up truck to the wheelchair outside of Appalachian's hospital in Whitesburg and then into the ER; and, if so, 2) whether, in doing so, Nurse Foote breached the applicable standard of care. The jury answered both those questions in the affirmative. (DE 331, Phase 1 Verdict.) In the second trial phase, the jury was asked to decide whether the amounts that Appalachian Regional paid to defend against and settle the Profitts' claim were reasonable. The jury determined they were. (DE 335, Phase 2 Verdict.) The Court entered judgment finding U.S. Nursing liable to Appalachian for $2,823,522.71.(DE 338, Judgment.)

U.S. Nursing appealed. The Sixth Circuit determined that this Court erred "in giving preclusive effect to the state court's summary judgment ruling that neither Hurt nor Parsons was the nurse who transported Profitt into the ER." *Appalachian Regional Healthcare, Inc.*, 824 F. App'x at 366. The Sixth Circuit found that U.S. Nursing "did not have a full and fair opportunity to litigate this issue at the state court level." *Id.* This is because it "had no legally protected interest in opposing the state court's grant of summary judgment for Hurt and Parsons." *Id.* at 366-67. The Sixth Circuit remanded

5

the matter to this Court "to determine in the first instance whether or not the error in granting the *in limine* motion requires a new trial." *Id.* at 370.

* * *

On remand, the Court ordered the parties to brief that issue. Thus, the evidence that U.S. Nursing claims implicates Nurses Hurt and Parsons is clear in this post-trial phase of the litigation. Both parties agree that the Court's analysis is governed by Federal Rule of Civil Procedure 61, which provides:

> Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61.

In a civil case like this, the party seeking to have the judgment set aside because of an erroneous ruling carries "the burden of showing that prejudice resulted." *A. K. by & Through Kocher v. Durham Sch. Servs., L.P.*, 969 F.3d 625, 629 (6th Cir. 2020). As to the standard for determining whether prejudice resulted, Appalachian argues that the Court should not grant a new trial unless U.S. Nursing proves that the excluded evidence "would have caused a different outcome at trial." (DE 379, Br. at 5.) In support of this standard, it cites the Sixth Circuit's decision in *Tompkins v. Phillip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. March 30, 2004), in which the Sixth Circuit stated, "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Id.* at 891 (quoting *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998)).

U.S. Nursing, on the other hand, argues the Court must grant a new trial if it lacks a "fair assurance" that the outcome of the trial was not affected by evidentiary

error. (DE 382, U.S. Nursing Response at 4; DE 383, U.S. Nursing Reply at 10.) In support of this standard, U.S. Nursing cites *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. July 29, 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009). In *Beck*, which was issued a few months after *Tompkins*, the court recognized that several Sixth Circuit opinions in civil cases had employed the different-outcome standard in determining whether the erroneous exclusion of evidence required a new trial. *Id.* at 635 (citing *Morales v. Am. Honda Motor Co.*, Inc., 151 F.3d 500, 514 (6th Cir.1998); *Nida v. Plant Prot. Ass'n Nat.*, 7 F.3d 522, 527 (6th Cir.1993); *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir.1989)). The court characterized the different-outcome standard as more onerous than the fair-assurance standard because it requires the movant to "show by a preponderance of the evidence that the error *was* outcome-determinative." *Id.* The court ultimately decided to follow the fair-assurance standard noting that it was employed by the Sixth Circuit in a published opinion in 1988 and that one Sixth Circuit panel cannot overrule the decision of another. *Id.* (citing *Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 157 (6th Cir.1988)).

More recently, in *Kocher v. Durham School Services, L.P.* 969 F.3d 625, 629 (6th Cir. 2020), the court stated that the burden is on the movant to show that "any errors affected their substantial rights." *Id* (citing Fed. R. Evid. 103(a); Fed R. Civ. P. 61; 28 U.S.C. § 2111.) The court overruled *Beck* but only to the extent that it may have placed the burden of proving harmlessness on the appellee (non-movant) in a civil case. *Id.* at 629-30. In a footnote, the court discussed the fair-assurance and different-outcome standards in noting the court's inconsistency in "whether to presume harm from error." *Id.* at 630, n.3.

7

This Court need not decide which standard to apply in this case because, under any of the standards, U.S. Nursing has not proved that a new trial is warranted.

Determining whether to grant a new trial requires the Court to examine "the proceedings in their entirety" to determine whether the error affected substantial rights. *Kendel v. Local 17-A United Food & Commercial Workers*, 512 F. App'x 472, 480 (6th Cir. 2013). The court must consider the centrality of the issue that the Court's error arguably affected and whether the evidence on the issue was one sided or "closely balanced." *Id.* "[I]n a civil case, the tie goes to the verdict." *Kocher*, 969 F.3d at 630.

The identity of the nurse who transported Profitt into the ER was a central issue in this case. If U.S. Nursing employee Nurse Foote did not move Profitt, then U.S. Nursing could not be liable to Appalachian. As to whether the evidence is closely balanced on this issue, even considering all of U.S. Nursing's evolving arguments regarding the evidence, the Court has at least a fair assurance that the outcome of the trial was not affected by the Court's ruling. U.S. Nursing has not proved the Court's error affected its substantial rights or that admitting any of the evidence that U.S. Nursing now cites would have caused a different outcome at trial.

In making this ruling, the Court has reviewed the entire record, including the evidence from the state court action that is part of the record. In its arguments at the status hearing before trial and in its current briefing on the issue, U.S. Nursing has relied largely on evidence that it argues shows U.S. Nursing employee Nurse Foote was *not* the nurse who moved Profitt (her name and initials are not in Profitt's chart; she had "no recollection of Mr. Profitt"; she testified her practice would have been to stabilize a patient like Profitt before moving him; Foote tended to a pediatric patient the same evening). (DE 380, Br. at 3-5; DE 353, Tr. at 6798) But the issue before the Court is not

8

whether there was sufficient evidence to support the jury's verdict that Nurse Foote *was* the nurse who moved Profitt into the ER.

If that were the issue, it would be easily resolved. The only parties that remembered the identity of the nurse who moved Profitt into the ER were Profitt and English (Profitt's co-worker who accompanied him to the hospital). None of the nurses recalled the incident. (Ct. Ex. C., Parsons Dep. at 15-16; Ct. Ex. D, Hurt Dep. at 11; DE 356, Foote Test. at 7329, 7331, 7332, 7334, 7336-37, 7344, 7349.)

English testified he was certain it was Foote that "actually brung the wheelchair out and grabbed Ralph from the armpits and . . . put him in the chair." (DE 355, Tr. at 7119.) He testified that the same nurse then pushed the wheelchair into the ER. (DE 355, Tr. at 7122, 7125.) English testified that the reason he was able to recognize Nurse Foote was because she was the nurse who came outside of the hospital and spoke with him directly. (DE 355, Tr. at 7133-34.) He testified there was "no question in [his] mind" that Nurse Foote moved Profitt. (DE 355, Tr. at 7119, 7135-36.) He had "no doubt" about it. (DE 355, Tr. at 7135.)

Profitt testified that he was "75 percent positive" that Nurse Foote was "the one that came out and got me out of the truck." (DE 355, Tr. at 7114) He testified that he was present for the depositions of all three nurses. (DE 355 at 7114.) He did not remember Nurse Parsons at all. (DE 355, Tr. at 7114.) He remembered Nurse Hurt from inside the ER, and he did not think she was the one who moved him into the ER. (DE 355, Tr. at 7113-14.) He testified that the female who moved him "didn't have our slang," meaning she "talked like she wasn't from around here," and that she was "fairly petite." (DE 355, Tr. at 7113.) He agreed that neither Nurse Parsons nor Nurse Hurt fit that description. (DE 355, Tr. at 7113, 7115.) Nurse Foote, on the other hand, is "5'2" tall and has never weighed more than 130 pounds." (DE 380, Br. at 7; DE 356, Tr. at 7353.) She

9

is not from Kentucky, had never been in Eastern Kentucky before she came to work for Appalachian, and the night that Profitt arrived at the Whitesburg hospital was Nurse Foote's first night on the job. (DE 356, Tr. at 7329.) She moved around frequently growing up, graduated high school in Germany, and moved to Texas in 1986. (DE 356, Tr. at 7354-55, 7328.) She worked at the Whitesburg hospital for only two months total. (DE 356, Tr. at 7328.)

The evidence that Nurse Foote moved Profitt was certainly sufficient to support the jury's verdict.[1] But, again, that is not the issue before the Court. The issue now is

---

[1] Further, none of evidence cited by U.S. Nursing proves that Nurse Foote did not move Profitt.

At the status conference conducted days before the trial, when explaining the evidence that proved Nurse Foote did not move Profitt, U.S. Nursing asserted that Nurse Foote testified, "I have no recollection of Mr. Profitt." (DE 353, Tr. at 6798.) But none of the nurses had any recollection of the event.

U.S. Nursing has also pointed to the fact that Nurse Foote later testified at trial in federal court that she did not move Profitt into the ER. (DE 356, Tr. at 7331, 7363). She testified, however, that this belief was based on her usual standard of care, not because she recalled the incident. (DE 7331, Tr. at 7331, 7334-35, 7344.) She testified repeatedly in this and the state court action, consistent with U.S. Nursing's argument at the status conference, that she did not recall the event or Profitt. (DE 356, Tr. at 7329, 7331, 7332, 7334, 7336-37, 7344, 7349.)

At the status conference prior to trial, as evidence that Foote did not move Profitt into the ER, U.S. Nursing also argued that Foote's name and initials are not in Profitt's chart, and she was attending a pediatric patient when Profitt was in the ER. (DE 353, Tr. at 6798-99.) Here, U.S. Nursing relies on Profitt's testimony that the nurse who moved Profitt into the ER also treated him. U.S. Nursing seems to argue that Nurse Foote could not have treated Profitt because her initials are not in Profitt's charts and she treated the pediatric patient in the ER the same evening. Thus, she could not be the nurse who moved him.

But the undisputed evidence showed that Nurse Foote more than likely did treat Profitt. As will be discussed further, Ellen Wright, chief nursing officer and vice president of nursing at Appalachian, testified that the customs of Appalachian would normally require "all hands on deck when a trauma patient [like Profitt] comes into the emergency room." (DE 355, Tr. at 7154.) As will also be discussed further, both English and Profitt testified that multiple nurses treated Profitt while he was in the ER. Wright testified that two other patients were in the ER when Profitt was, but that the records show "very minimal nursing intervention documented" in either chart and that no nurses were in the rooms with the other patients when Profitt was in the ER. (DE 355, Tr. at 7152.) Wright testified that, based on the normal practices of the hospital, Foote would have been in the room treating Profitt while he was there. (DE 355, Tr. at 7160.) Wright testified that the fact that Nurse Foote's name and initials are not in Profitt's chart does not mean she did not treat him. (DE 355, Tr. at 7160.) In fact, she testified that, based on the normal practices at the hospital, Foote likely did treat Profitt when he was in the ER. (DE 355, Tr. at 7160.)

As to the pediatric patient in particular, Wright testified that the patient's records did not indicate that the patient needed continuous nursing care while in the ER and that the records

10

whether there is sufficient evidence that Nurse Parsons or Hurt moved him so that the exclusion of that evidence affected U.S. Nursing's substantial rights.

In its current briefing, U.S. Nursing again points to the same two facts as proof that Nurse Hurt moved Profitt as it did at the status conference before trial. First, it argues that Profitt testified that the nurse "who wheeled him into the emergency room was the *same* woman who initiated the procedures in the emergency room and stayed with him the *entire time*." (DE 380, Br. at 5.) Second, Nurse Hurt's "name, initials and handwriting appear *throughout* Profitt's medical chart." (DE 380, Br. at 4.)

Other undisputed evidence, however, would prevent a jury from fairly inferring that, because a nurse treated Profitt in the ER, she was the nurse who moved him there. The evidence is undisputed that multiple nurses treated Profitt after he was inside the ER. Profitt testified that that the nurse who pushed him into the ER was "*one of the ones that stayed there.*" (DE 355, Tr. at 7108) (emphasis added). He remembered the nurse who pushed him into the ER "talking to the other nurses as she came in." (DE 355, Tr. at 7108.) He testified, "After they got me in through the doors and over to the bed, there was several people. So I don't know who was staying and didn't." (DE 355, Tr. at 7108.) English confirmed this testimony. He testified that two nurses put Profitt into a hospital bed when he was inside the ER, and neither was the one who moved him there. (DE 355,

---

indicated that Nurse Foote did not treat the patient while Profitt was in the ER. (DE 355, Tr. at 7156.) None of this testimony by Wright was disputed. Nurse Foote testified that she could not say whether she attended the pediatric patient while Profitt was in the ER. (DE 356, Tr. at 7338-39.) She had no recollection of the patient. (DE 356, Tr. at 7368.) The only knowledge she had of the patient was what the medical chart reflected (DE 356, Tr. at 7372), and she agreed that the patient's medical chart reflected that she treated the patient only before Profitt arrived and after Profitt left. (DE 356, Tr. at 7340.)

Finally, in the most recent briefing on the issue, U.S. Nursing points to English's testimony that the nurse who moved Profitt had on white scrubs and to Nurse Foote's testimony that she had not worn white scrubs since 1982. (DE 356, Tr. at 7353.) As will be discussed further in this opinion, however, there is no evidence that any of the three nurses had on white scrubs the night that Profitt arrived at the hospital.

11

Tr. at 7127-28). There were other people from the hospital in the room also. (DE 355, Tr. at 7128.) Again, English was 100 percent certain that the nurse who moved Profitt was Nurse Foote, and Profitt was 75 percent certain of that fact, and he agreed that neither Nurse Hurt nor Parsons fit his description of the nurse who moved him.

The undisputed evidence is that the initials of all the nurses who treated Profitt would not appear in his medical file. Ellen Wright, chief nursing officers and vice president of nursing at Appalachian, testified that, when a trauma patient like Profitt enters the ER for treatment, it would normally mean "all hands on deck." (DE 355, Tr. at 7154.) She testified, in such situations, there is a "whole flurry of activity" with "everything happening sort of at one time, " and "it doesn't always get documented who does what." (DE 355, Tr. at 7161.) She testified this is why it cannot be inferred that a nurse in the ER did not treat a trauma patient simply because her names and initials are not in the patient's chart. (DE 355, Tr. at 7160.)

Thus, a jury could not fairly infer that, simply because Nurse Hurt was one of the nurses who treated Profitt, she was the one who moved him to the ER. U.S. Nursing has pointed to no other evidence as to Nurse Hurt, and the Court has located none in the record.

As to Nurse Parsons, U.S. Nursing now argues for the first time that some evidence points to her as the one who moved Profitt into the ER. First, it asserts that Wright testified in her deposition that "*Parsons was stationed at the front desk* the night of Profitt's incident." (DE 380, U.S. Nursing Br. at 10 (citing Ellen Wright Dep. at 40-41.) Citing Wright's testimony, it asserts that "Parsons was the only nurse working at the front desk when [Ken] Jaworski presented to the emergency room." (DE 383, Reply at 6.) Jaworski was Profitt's co-worker who drove Profitt and English to the hospital in his truck. (DE 355, Tr. at 7098.)

Wright did not exactly testify that Nurse Parsons was stationed at the front desk when Jaworski arrived in the ER or that she would have been the only nurse there.[2] More importantly, however, there is no evidence that the identity of the person working at the ER front desk that evening has anything to do with the identity of the nurse who moved Profitt into the ER. U.S. Nursing cites the testimony of Jaworski. (DE 380, Br. at 11.) Jaworski testified that he parked in front of the ER, got out of the truck, and went in. (DE 356, Tr. at 7382, 7386.) He testified that he went to the front desk in the ER and told a female behind the counter that an injured man was outside. (DE 356, Tr. at 7382, 7386.) He testified that a female came out with a wheelchair. (DE 356, Tr. at 7383, 7387.) He explicitly stated that he did not know if the female behind the desk was the same one who came out with the wheelchair. (DE 356, Tr. at 7387.)

The second piece of evidence that U.S. Nursing argues implicates Nurse Parsons is English's testimony that the nurse who came out of the ER to get Profitt was wearing white scrubs. (DE 380, U.S. Bf. at 11; DE 355, at 7134.) U.S. Nursing points to no evidence, however, that Parsons ever wore white scrubs, let alone on the night in question. U.S. Nursing asserts that Wright testified that "ARH-employed nurses did wear white scrubs." (DE 380, U.S. Nursing Bf. at 11.) But that is not a correct representation of Wright's testimony. In the testimony that U.S. Nursing cites, Wright does not testify that Appalachian nurses wear white scrubs. Nor did she testify that Appalachian nurses worse white scrubs on the night at issue. More importantly, Wright

---

[2] In the Wright testimony cited by U.S. Nursing for this point, Wright testified that Parsons "often" staffed the ER desk at the emergency room because her role was to both help with patient care and to do clerical work. (Ct. Ex. D, Wright Dep. Test. at 40.) She did not testify, as U.S. Nursing argues, that Parsons was the only Appalachian employee who had the duty to greet family members and patients arriving at the ER. (DE 380, U.S. Nursing Br. at 10-11.) She testified that no other member of the *clerical* staff would be involved in "greeting family members, or patients that are walking into their ER, being wheeled into the ER, coming in by ambulance." (Wright Dep. at 40-41.)

13

did not testify that Nurse Parsons wore white scrubs ever, and she certainly did not testify that Parsons wore white scrubs the night that Profitt arrived.

When asked whether nurses were required to wear a "particular uniform," Wright testified, "At that time, I do not recall there being any specific uniform code. I don't recall." (Ct. Ex. D, Wright Dep. Test. at 49.) She testified, "Nursing always wore some type of nursing uniform. I just don't recall if there was any specific color code at that time." (Ct. Ex. D, Wright Dep. Test. at 50.) She testified that Appalachian provided money to registered nurses, and they purchased their own uniforms. She testified that Appalachian provided uniforms for LPNs and nurse aides, but that "some also choose to buy their own in addition." (Ct. Ex. D, Wright Dep. Test. at 50.) She testified that, if Appalachian "had a color scheme at that time, we would provide [the LPNs and nurse aides] whatever color that was. If there wasn't a specific color, they would select from a catalog." (Ct. Ex. D, Wright Dep. Test. at 50.) When asked whether there was a uniform policy at the Whitesburg hospital at the time of her deposition (May 23, 2017 – about ten years after the Profitt incident), she testified, "We have been all over the board with this . . . We've had it specific colors, we've been all white, we let them go back to select unit specific. I honestly do not know what their current policy is." (Ct. Ex. D, Wright Dep. at 50-51.) When asked if she had any idea what the females were wearing in the ER on the night of the Profitt incident or what color scrubs they would have been wearing that night, she explicitly testified, "I do not." (Ct. Ex. D, Wright Dep. at 53.)

Thus, while English did testify that the nurse who transported Profitt had on white scrubs, a jury could not possibly infer from this that Nurse Hurt or Parsons was the nurse who moved Profitt.

The Court has reviewed the record for any and all evidence that points to Nurses Hurt or Parsons as the nurse who moved Profitt. In its recent brief, U.S. Nursing

14

summarizes in writing the evidence as to Parsons as follows: 1) "Parsons was the only nurse working at the front desk when Jaworski presented to the emergency room," 2) "a nurse in white scrubs came out with a wheelchair," and 3) "ARH-employed LPNs like Parsons were *provided* scrubs, and that ARH-employed nurses worse white scrubs." (DE 383, Reply at 6.) In the same reply brief, U.S. Nursing summarizes is evidence as to Nurse Hurt as follows: 1) "Profitt's testimony that the woman who transported him into the emergency room stayed with him throughout his time" at the Whitesburg hospital and "started all his procedures and treatment," and 2) "Hurt was the only nurse in Profitt's medical records." (DE 383, Reply at 6.)

The Court has explained why each of these five points is either an inaccurate portrayal of the evidence or insignificant to the identity of the nurse who moved Profitt. The evidence on this issue was not "closely balanced." The only eyewitnesses who recalled the nurse's identity identified Nurse Foote as the nurse who moved Profitt, and they provided a reasoned explanation that supported that recollection. There is simply no evidence from which the jury could fairly infer that Nurse Hurt or Parsons moved Profitt. Thus, the Court's ruling precluding any such evidence did not affect U.S. Nursing's substantial rights. Justice does not require a new trial, setting aside the verdict, or otherwise disturbing the judgment entered in this case. Fed. R. Civ. P. 61.

Dated September 24, 2021

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY

15